WILKINSON, Circuit Judge, concurring:
 

 I am happy to concur in Judge Diaz's fine opinion. For the reasons given in that opinion, I agree that the charge levied on Norfolk Southern by the City of Roanoke is a fee and not a tax. I write separately to describe how this case fits into the larger story of environmental restoration.
 

 I.
 

 Captain John Smith's party could hardly convey to readers the "abundance of fish lying so thicke" that exceeded any river in Europe: "Neither better fish, more plenty, or variety, had any of us ever seene, in any place swimming in the water, then in the Bay of Chesapeack ...." Walter Russell & Anas Todkill et al.,
 
 The Accidents That Happened in the Discoverie of the Bay
 
 ,
 
 in
 
 1
 
 The Complete Works of Captain John Smith (1580-1631)
 
 224, 228 (Philip L. Barbour ed., 1986). Before the arrival of Captain Smith, the Algonquin Indians recognized the extraordinary productivity of the Bay, terming it "Chesepioc," meaning "great shellfish bay." Christopher P. White,
 
 The Chesapeake Bay Field Guide
 
 , 3 (1989). More than a century later, in 1728, William Byrd II wrote that "one might believe, when he sees such terrible amounts of them, that there was as great a supply of herring as there is water. In a word, it is unbelievable, indeed, indescribable, and also incomprehensible, what quantity is found there. One must behold oneself." William Byrd,
 
 The Newly Discovered Eden
 
 78 (Richmond C. Beatty & William J. Mulloy eds., trans., 1940).
 

 Today, one no longer can. Instead of fish, we quantify phosphorus, nitrogen, sediment, and other pollutants. Clouds of sediment and algal blooms blot out the sun, leaving the subaqueous flora starved for photosynthetic fuel. U.S. Environmental Protection Agency,
 
 Chesapeake Bay: Introduction to an Ecosystem
 
 , 4 (Kathryn Reshetiloff ed., 1995). As the underwater grasses die for lack of sun, the fauna that rely on them begin to die as well.
 

 Id.
 

 Microscopic zooplankton and small invertebrates that feed on the grasses are deprived of their food. Alice Jane Lippson and Robert L. Lippson,
 
 Life in the Chesapeake Bay
 
 , 175, 192 (2006). In turn, species of fish and fowl that feed on these creatures lose their food as well.
 
 Id
 
 . Blue crabs lose a safe place to hide after they shed their hard shells during their seasonal molting. Christopher P. White,
 
 Chesapeake Bay: A Field Guide
 
 , 84 (1989). And fish like menhaden and croakers, which use the grasses as protective nurseries, are deprived of a safe place to nurture their young. Alice Jane Lippson and Robert L. Lippson,
 
 Life in the Chesapeake Bay
 
 , 190 (2006). Those fish that remain suffer from contamination by metals like chromium and mercury or organic contaminants like PCBs and pesticides. Karl Blankenship, "Report finds evidence of toxic contaminants impacting fish," Bay Journal (January 1, 2013).
 

 But all that has happened, and is happening, need not always happen. And therein lies the future of Virginia's waters and the Bay.
 

 II.
 

 Restoring damaged waters like the Chesapeake Bay requires sustained effort, entailing cooperation and coordination among the federal government, "[s]tate and local governments, the enterprise of the private sector, and ... all the people who make this region their home." Exec. Order No. 13508,
 
 74 Fed. Reg. 23099
 
 , 23100 (May 12, 2009). Chesapeake Bay restoration would be impossible without stitching together the efforts of a vast number of people from diverse walks of life: cattle farmers in West Virginia, lawn
 care specialists in New York, and golf course operators in Pennsylvania, to name a few, not to mention countless public servants-town managers, environmental experts, Cooperative Extension agents. All share a common goal and corresponding common burdens.
 

 The response to the problem of stormwater runoff demonstrates the necessity of cooperation between all levels of government and private actors. Stormwater is of particular concern to environmental restoration: when it falls on impervious surfaces like streets or parking lots, it picks up pollutants like motor oil, animal waste, or just plain dirt, and washes them into the local streams. These pollutants contain chemical contaminants and the nutrients that feed algal blooms. They make their way through streams and tributaries, causing harm along the way, until they collect in the estuary where the rivers meet the ocean. William H. Funk, "Virginia Artificial Wetland a Game-Changer for Stormwater Pollution," Chesapeake Bay Magazine (June 13, 2017).
 

 The scheme that regulates stormwater runoff begins with the federal government which, through the Clean Water Act, mandates that states set water quality standards that any given river must meet.
 
 33 U.S.C. § 1313
 
 . If the river does not meet the water quality standards, the state government steps in and works with the EPA to put the river on a "pollution diet" or Total Maximum Daily Load (TMDL).
 

 Id.
 

 The TMDL establishes the total amount of each pollutant that is allowed to drain into the river, and slowly reduces that amount to a level consistent with federally mandated water quality standards.
 

 Id.
 

 One of the ways the state then implements the TMDL is by adjusting the permits it gives to entities within the river's watershed so that the total amount of pollution these entities are allowed to drain into the river is below the overall limit. Local governments must obtain one of these permits to manage the flow of stormwater from their sewer system into local waterways.
 

 The City of Roanoke's stormwater clean-up scheme, which is governed by its permit, is what's at issue here. While not in the Bay's watershed, the Roanoke River is itself worthy of protection, and the City of Roanoke's program is a prime example of the type of stormwater remediation efforts that localities in the Bay's watershed must enact. A ruling for Norfolk Southern here would have deleterious implications for comparable municipal stormwater programs that are within the Bay's watershed like Richmond, Charlottesville, and Lynchburg. Richmond, Va., Code art. V., § 14-336 (2017); Lynchburg, Va., Code art. V., § 16.2-56 (2018); Charlottesville, Va. Code art. VI., § 10-104 (2018). And so while this case does not deal directly with the Chesapeake's waters, its health is very much at stake here.
 

 Under its permit, the City of Roanoke has the burden of reducing stormwater pollution, but it can only do this with the cooperation of its residents. In addition to maintaining its sewer infrastructure, the City coordinates with local "watershed associations, environmental advisory committees, and other environmental organizations." J.A. 156. The City also helps its residents install features like rain gardens and detention ponds that soak up the stormwater rather than allowing it to drain immediately into the river. And, importantly, the City relies on its residents to help fund its stormwater clean-up efforts through the fee at issue here.
 

 III.
 

 In seeking to avoid paying a fee that the City uses to fund its stormwater clean-up scheme, Norfolk Southern, one of the largest property owners in Roanoke, is seeking
 to absolve itself of responsibility. Stormwater runs off the railroad's property into the City's sewer system. The City must then treat and manage this water to comply with its permit. This costs money. If the City could not charge a fee to Norfolk Southern, Roanoke would bear the burden of managing the railroad's runoff alone. Erroneously deeming this fee a tax under the Railroad Revitalization and Regulatory Reform Act would, as the railroad knows, run the decided risk of limiting its contribution to the broader project of stormwater management. The City would thus lose important revenue needed to offset the costs of building and maintaining municipal gutters and drains, monitoring pollution levels, policing illegal discharges of polluted water, and educating the public on proper environmental practices. Norfolk Southern would, in effect, be shifting its burden to the City. What we have here is the irony of a railroad seeking a free ride.
 

 This is unacceptable. As Judge Diaz aptly notes, "the charge is part of a regulatory scheme, rooted in the Clean Water Act, whose purpose is to remedy the environmental harms associated with stormwater runoff and to hold stormwater dischargers responsible for footing the bill." Maj. Op. at 322. The arteries of the Chesapeake Bay wend through six states, including three in the Fourth Circuit (Maryland, West Virginia, and Virginia). Numerous localities in the Bay's watershed have clean-up schemes with fees comparable to Roanoke's. Norfolk Southern's position would put these projects at risk.
 

 Our rivers and estuaries are complex, interconnected ecosystems. It follows, therefore, that efforts to restore them are correspondingly complex and interconnected. Without the cooperation of all levels of government, as well as of private companies and citizens, our waters will continue to be compromised by pollution. The restoration effort imposes burdens on many people; happily, the benefits of clean waters (economic; health; scenic; recreational) accrue to just as many if not more. Everyone, including the owners and employees of Norfolk Southern, are better off when our streams run clear and estuarine flora and fauna are flourishing. It is only fair to ask those who benefit to shoulder some of the burden.
 

 No one is so naïve as to believe that the Chesapeake Bay can be restored to the pristine condition viewed by John Smith and William Byrd, or that the Roanoke River and its tributaries such as Peters Creek and Tinker Creek can be restored to the condition in which this country's earliest inhabitants found them. We would be fortunate to preserve a wholesome fraction of what once there was. This case is but a tiny chapter in the story of our nation's effort to reconcile the just demands of development with the imperative of preserving an environment that can help make productive enterprise worth having. A reversal here might seem just a small setback. But a series of such setbacks accelerates rather than retards the degradation of the natural world. We happily accepted the abundance that came down from our forebears. How then can we impoverish the environment for those who come after?